FILED

DEC 2 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES GORDON, F-18730, | No. C 10-1770 CRB (PR) |
| Petitioner, | ORDER DENYING |
| | PETITION FOR A WRIT OF |
| vs. | HABEAS CORPUS AND |
| | DENYING CERTIFICATE OF |
| RAUL LOPEZ, Warden, | APPEALABILITY |
| Respondent. | |

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254.  In an order filed on August 23, 2010, the court found that the petition, liberally construed, stated a cognizable claim under section 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer to the order to show cause and petitioner has filed a traverse. Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief.

## STATEMENT OF THE CASE

A Contra Costa County Superior Court jury convicted petitioner and co-defendant Darryl Daniels of two counts of attempted murder that was willful, deliberate and premeditated, and one count of second degree robbery.  The jury also found Daniels guilty of carjacking, discharging a firearm from a vehicle and discharging a firearm at an occupied vehicle, and found true a number of firearm-

related enhancement allegations. After finding true additional allegations that petitioner had two juvenile adjudications that qualified for sentencing under the Three Strikes law, the trial court sentenced him to a total prison term of 111 years to life. Daniels was sentenced to a total prison term of 56 years and eight months to life.

Petitioner unsuccessfully appealed his conviction and sentence to the California Court of Appeal and the Supreme Court of California, which denied review of a petition allegedly raising the same claims raised here. The Supreme Court of the United States denied his petition for a writ of certiorari on October 20, 2009.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> Audie Williams testified that on September 22, 2004, he was talking to a woman on a street in Pittsburg when "I felt a gun stuck up in my back." A man demanded "everything I had," whereupon Williams surrendered $270 and a cell phone. Williams initially identified the robber to police as defendant Gordon, although at trial he testified that it was not Gordon. Pittsburg Police Officer Togonon and Detective Deplitch testified that Williams immediately, repeatedly, and emphatically identified Gordon as the man who robbed him.
>
> Hilario Martinez testified that his personal property and his automobile were taken from him on December 1, 2004. Martinez testified that he was walking towards his Buick LeSabre when two men approached. One of the two men was Daniels, whom Martinez recognized. Either Daniels or the other man-Martinez did not remember which-showed a gun. One of the two-again Martinez did not remember which-demanded that Martinez hand over his cell phone and the keys to his car. Martinez did so. Daniels was observed driving Martinez's car ten days later.
>
> Daniels and Gordon were convicted of the attempted murder of Sean McClelland. McClelland did not testify because he died before the trial. Pittsburg Police Officer Erik Severe testified that on the evening of December 17, 2004, he went to a hospital and spoke with McClelland, who had been shot eight times outside the Woods Manor apartment complex. McClelland refused to identify who had shot him. Officer Severe testified that after he left McClelland he went to the apartment complex, where he observed a number of .40 and 9 mm. shell casings. The casings, which were

clustered together by caliber, were collected as evidence. No witness to the shooting w

Rhonda Hardy testified that in December 2004 she lived at Woods Manor. She was friendly with Daniels and Gordon; her brother Steve was also a friend of Gordon's. Hardy also knew Sean McClelland, who was dating Gordon's sister, and who was often seen with Gordon.

Hardy testified that one evening in mid-December, Daniels and Gordon were at her apartment and she heard Daniels talking on the telephone to McClelland, telling him to come to one of the Woods Manor apartments "to come pick up the gun." Gordon left, then called the apartment and spoke to Daniels. Gordon returned, picked up Daniels-who put on "one of those pull-over hats"-and the two then left. Hardy testified that she saw Daniels and Gordon wait for McClelland. Each had a gun. When McClelland appeared, "they just started shooting." After McClelland staggered away, Daniels and Gordon stopped firing, and they ran from the scene.

That night, and again the next day, Gordon menacingly asked Hardy "what happened" and "what [did] I see." Hardy replied "nothing" because she spoke was scared. "He asked me did I see who it was, and I just told him no." Gordon told Hardy "[D]on't talk to the police. [¶] ... [¶] They say they was killing everybody who was talking. Babies, mommas, kids, everything." The day after the shooting Daniels dropped by Hardy's apartment and threatened that "they would kill me, my mama, and my son" if she talked to police. In fact, "both of them," that is, Daniels and Gordon, threatened to kill her if she spoke with police. Moreover, both Daniels and Gordon in essence moved into Hardy's apartment and stayed for months, to ensure that she did not inform authorities of what she had seen.

Hardy testified about one occasion when one of the investigating officers came to her apartment while Gordon was there. Gordon would not allow Hardy to answer the knocking at the front door, and the officer left, after which Gordon remarked that "he could have shot him right then and there." Hardy called the telephone number on the card left by the officer. She told him about the McClelland shooting because "they [Daniels and Gordon] was threatening me, and I got tired of it." Daniels and Gordon not only threatened Hardy, they also threatened her teenage son, whom she told to stop visiting at her apartment.

After Hardy told the police, and suspecting that she had, Gordon threatened her that "if we find out that you have been talking to the police we are going to kill you, I'm killing mommas, I am killing daddies, I'm killing kids, it don't matter. I'm killing everybody." Hearing this, Daniels "just laid a gun on his lap." Both Gordon and Daniels always carried a gun. Hardy further testified about overhearing Daniels and Gordon say that they shot McClelland the day before because they were convinced he was complicit in a shooting where Daniels was wounded, and because he was reputed to be bad-mouthing Daniels.

Hardy also testified that after she talked with police, she

received communications from Daniels's father, and even Hardy's own brothers, one of whom is in San Quentin. These communications induced sufficient fear in Hardy that she was put in the Witness Protection Program, and is currently receiving approximately $400 per month for her living expenses. Hardy testified on cross-examination that she was a regular if not heavy user of drugs, who often got her drugs from Daniels or Gordon. Hardy testified that she talked to police to avoid Daniels and Gordon being killed by police trying to apprehend them.

David Wagner testified that on the afternoon of January 12, 2005, he was walking home from work. He was near the Parkside Market on Davi Avenue in Pittsburg when he noticed a white sedan stopped in the middle of the intersection. The car had three African-American male occupants, one driving and two in the back seat. Wagner further testified that he heard a "bang" and saw a man "falling." The car then "took off" at high speed. Wagner called 911.

The man shot was Irving Griffin, who testified that on January 12 he and his cousin Dupree Straughter were approaching a market on Davi Street when he was shot in the back. Griffin never saw two men jump out of a white car, and he had no memory of being shot. Griffin knew Daniels because "[w]e was incarcerated in Byrons Boys Ranch;" he did not know Gordon. Griffin further testified he did not recall telling Officer Sullivan that he saw a white Buick speeding away from the scene.[1] After he was taken to the hospital, Griffin told police there was no reason for him to attempt to identify who shot him because he did not see his assailants. Officer Sullivan, who spoke with Griffin at the scene of the shooting, and subsequently at the hospital, testified that he believed Griffin was evading answering his questions.

Derrick Blanche testified that he met with Griffin in the hospital after Griffin was shot. Griffin (who at trial did not recall talking to Blanche) was unable to identify who shot him. Blanche denied telling Officer Deplitch that Griffin had identified defendants. Officer Deplitch testified that Blanche told him that Griffin did identify defendants as his assailants.[2]

Griffin's cousin Dupree was a witness to the shooting. He testified that he was walking on the street with Griffin when his cousin saw something and "panicked." They ran and hid behind a building waiting for, in Griffin's words, "somebody to go by." Straughter further testified that he and Griffin had resumed walking when they "heard gunfire" and Griffin was on the ground screaming for help.

---

[1] Officer Sullivan testified that Griffin did make such a statement, although the vehicle was identified as an Oldsmobile.

[2] Actually, Blanche did not use defendants' real names, but their "street" names-"Dal" for defendant Daniels and "Jam" for defendant Gordon. These names were used by others throughout the trial.

Straughter further testified that after the shooting, Officer Blazer of the Pittsburg police "threw me straight in the back of a police car, and I sat there for a long time."[3] Straughter acknowledged that he told an officer that, before the shooting, Griffin had pointed to a number of persons and said "he had problems with" them. The persons then got into a white car, but by then Straughter and Griffin were behind the building. Straughter did not see the white car again. Straughter did not identify the occupants beyond saying that they were from the "El Pueblo" area of Pittsburg. Straughter testified that he was not trying to be uncooperative, but that he was in shock.

Paul Fordyce and Steven Kaiser testified about a shooting incident they observed on January 12, 2005. They were stopped in separate cars at a stop light on Somersville Road in Pittsburg, when they saw Daniels emerge from a white two-door American-made vehicle waiting for the light. Both testified that they observed Daniels walk over to a brown-colored vehicle, produce a gun, and fire five to six shots, disintegrating the rear window. When the brown car drove away, Daniels ran back to the white car, which quickly left the scene.

The white vehicle was possibly Martinez's stolen two-door Buick. Fordyce testified that the white car he saw was an Oldsmobile, while Kaiser remembered it as "either a Buick or an Olds." Fordyce testified that Daniels was wearing a camouflage jacket and a black wool knit cap. Kaiser recalled the cap as a dark-colored "ski cap," and the coat as merely "bulky" and unzipped.

Although both Fordyce and Kaiser made positive identifications of Daniels at trial, this differed from how they behaved immediately after the shooting. Kaiser was willing to look at a photo lineup, and identified Daniels. But Fordyce would not, because he did not want to get involved.

A number of shell casings recovered at the scene were subjected to ballistic analysis and determined to have been fired from the same .40 Smith and Wesson pistol used in the McClelland shooting. From photographs of Gordon holding a Sig/Sauer pistol and a Smith and Wesson revolver, an expert testified that either of these weapons could have fired the .40 cartridges. Hardy gave to police a box of Smith & Wesson .40 calibre ammunition at the scene left at her apartment by defendants. The box had blood on it.

Daniels was arrested on January 29, 2005 after the car he was in was stopped for speeding. A black knitted cap was found in the car.

---

[3]Officer Blazer described Straughter immediately after the shooting as being "very evasive with any forthcoming information."

Tiffany Hart testified that she was friendly with Gordon and Daniels. She had seen Daniels and Gordon carrying guns, but not during January 2005.

Hart was interviewed by Officer Deplitch on January 25 and February 15, 2005, and her version at trial was that she did not tell Deplitch that: (1) she saw Daniels, Gordon, or an individual named Alvin Harvey on January 12; (2) Daniels and Gordon were in possession of handguns on that date; or (3) Daniels and Gordon carried guns on a daily basis. With little warning, Hart blurted out that everything she had told Deplitch was untrue.[4]

With the aim of introducing everything Hart had said to Deplitch, the prosecutor then marched through a series of "When you told Detective Deplitch that ..., that was a lie?" questions. Hart admitted that she still wrote letters to Gordon and visited him in jail.[5] Hart further testified that she told Deplitch nothing at the February 15 interview about the Griffin shooting or the events of January 12. Hart concluded her direct examination by testifying that there was no way she would have voluntarily come to court.

On cross-examination, Hart testified that she was told by Deplitch that if she testified "he would help me with a case ... that I have" (possibly a reference to a pending prostitution charge). However, she admitted that it was she who approached Deplitch; he did not come to her. Hart further testified that many of the things she had said to Deplitch were motivated by anger at Gordon, whom she nevertheless loved.

Officer Deplitch then took the stand and authenticated the videotape made of his January 25 interview with Hart. The tape was played for the jury and later admitted in evidence. On the tape, Hart told Deplitch that McClelland had told her that he was shot by Daniels and Gordon. When Hart asked Gordon if this was true, Gordon admitted that it was, that he and Daniels shot McClelland because he was believed responsible for getting Daniels shot in Richmond. As for the shooting of Griffin, Hart told Deplitch that on January 12, she, Daniels, Gordon, and Harvey were riding in a white sedan (variously described by Hart as a Buick or an Oldsmobile), with Daniels wearing a black knit cap. Daniels and Gordon saw two men (presumably Griffin and Straughter) walking on the street, and Daniels and Gordon resolved to shoot Griffin. Apparently, it was the noise of Daniels accidentally dropping his

---

[4]  This admission came after Hart suddenly announced that she would answer no more questions. The court ordered her to answer questions and allowed the prosecutor to treat her as a hostile witness. Hart then resumed answering questions, for a while, and then again announced "I am not answering shit."

[5]  The parties stipulated that in the several months prior to trial Hart had written letters to Gordon in which she had called herself Gordon's "wife."

gun on the street that caught Griffin's attention and caused him to run. Daniels and Gordon returned to the vehicle and began driving around, looking for Griffin, with Daniels and Gordon both saying "We gonna get them." When they spotted Griffin, Gordon drove the car at him. Gordon told Daniels "Shoot him." After Daniels shot Griffin in the back, Daniels and Gordon laughed about the shooting as they drove away.

Daniels did not testify or present any evidence.

The sole witness called by Gordon was Pittsburg Police Officer Ligouri who testified that she was one of the officers who investigated the Griffin shooting. Officer Ligouri testified that she spoke to a witness named Amber Wheeler, who told her that three black men in a white Buick were responsible for the shooting. Wheeler heard only a single shot. According to Officer Ligouri, Wheeler recounted that she asked Straughter who shot Griffin, and Straughter replied he did not know.

People v. Daniels, No. A113184, 2009 WL 568918 at *1-5 (Cal. Ct. App. March 06, 2009) (footnotes in original but renumbered).

## DISCUSSION

**A.     Standard of Review**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v.</u>
<u>Taylor</u>, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application' clause,
a federal habeas court may grant the writ if the state court identifies the correct
governing legal principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413.

"[A] federal habeas court may not issue the writ simply because that court
concludes in its independent judgment that the relevant state-court decision
applied clearly established federal law erroneously or incorrectly.  Rather, that
application must also be unreasonable." <u>Id.</u> at 411.  "[A] federal habeas court
making the 'unreasonable application' inquiry should ask whether the state
court's application of clearly established federal law was objectively
unreasonable." <u>Id.</u> at 409.

The only definitive source of clearly established federal law under 28
U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme
Court as of the time of the state court decision.  <u>Id.</u> at 412; <u>Clark v. Murphy</u>, 331
F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive
authority" for purposes of determining whether a state court decision is an
unreasonable application of Supreme Court precedent, only the Supreme Court's
holdings are binding on the state courts, and only those holdings need be
"reasonably" applied.  <u>Id.</u>

**B.    Claims & Analysis**

Petitioner claims that:  (1) his rights were violated in relation to admission
of hearsay evidence of a statement by his co-defendant, Daniels, that implicated
him; (2) because petitioner's two juvenile adjudications involved proceedings in
which a jury trial was not available, the sentencing court violated his Sixth
Amendment rights when it treated them as "strikes" that increased his sentence;
(3) the prosecutor committed misconduct in closing argument, and counsel was
ineffective in failing to object; (4) counsel was ineffective in failing to object to

certain hearsay testimony regarding the shooting of victim Irving Griffin; and

(5) the cumulative effect of the above errors was that he was denied a fair trial.

### 1.    **Bruton** Claim

In the form petition that Gordon filed in this Court, petitioner's first issue

is a contention that his Sixth Amendment right to confront a witness against him

– in this case, his co-defendant Daniels – was violated when the trial court

admitted hearsay evidence of a statement by Daniels that implicated him.  In

support of this proposition he cites <u>Bruton v. United States</u>, 391 U.S. 123, 126,

135-36 (1968).  He does not mention ineffective assistance in regard to this claim

in the petition itself, but attached to the petition is a copy of his petition for

review in the California Supreme Court, in which his counsel both raised the

merits of the <u>Bruton</u> claim and contended that trial counsel's failure to object to

the alleged <u>Bruton</u> error constituted ineffective assistance.  Because petitioner is

pro se, the Court will treat both claims as having been raised here.

Petitioner presented these claims in his direct appeal.  The California

Court of Appeal had this to say about them.

> Gordon first contends that he was the victim of <u>Aranda-Bruton</u> error when the jury heard hearsay testimony from Hardy about a statement made by defendant Daniels concerning the attempted murder of Griffin.

> The legal principle commonly abbreviated as <u>Aranda-Bruton</u> is based on a criminal defendant's rights of confrontation and cross-examination. Our Supreme Court explained the matrix of the principle:

> "A recurring problem in the application of the right of confrontation concerns an out-of-court confession of one defendant that incriminates not only that defendant but another defendant jointly charged. Generally, the confession will be admissible in evidence against the defendant who made it (the declarant). (<u>See</u> Evid.Code, § 1220 [hearsay exception for party admissions].) But, unless the declarant submits to cross-examination by the other defendant (the nondeclarant), admission of the confession against the nondeclarant is generally barred both by the hearsay rule (Evid.Code, § 1200) and by the confrontation clause (U.S. Const., 6th Amend.). If the two defendants are tried together, the court may instruct the jury to consider the confession in determining the guilt only of the declarant, but it may be psychologically impossible for

9

1    jurors to put the confession out of their minds when determining
2    the guilt of the nondeclarant. The United States Supreme Court has held that, because jurors cannot be expected to ignore one
defendant's confession that is 'powerfully incriminating' as to a
3    second defendant when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation
4    rights of the nondeclarant. (Bruton v. United States [, supra,] 391 U.S. 123, 126-127.) Earlier, this court had reached a similar
5    conclusion on nonconstitutional grounds. (People v. Aranda (1965) 63 Cal.2d 518, 528-530.)" (People v.. Fletcher (1996) 13 Cal.4th
6    451, 455, fn. omitted.)[6]

7       Gordon's Aranda-Bruton issue arose in the following
circumstances:

8

9       On direct examination, the prosecutor, Ms. Knox, asked Hardy:

10       "Q. Ms. Hardy, did either Dal [Daniels] or Jam [Gordon]
talk to you about a shooting on Davi Street?

11

12       "A. Darryl did.

13       "Q. And when he talked to you about that shooting, did that
conversation take place the day after the shooting?

14       "A. Yeah.

15       "Q. Okay. Where did you talk to him about that?

16       "A. Outside ... [¶] ... [¶] In the parking lot ... [¶] ... [¶][of]
Woods Manor.

17

18       "Q. And what did Darryl tell you about the shooting that
happened on Davi Street?

19       "A. Him, Alvin, Tiffany and Jam-

20   "MR. SIINO [counsel for Daniels]: Objection, hearsay.

21       "THE COURT: Ms. Knox.

22       "MS. KNOX: Your Honor, it's [a] statement made by a
co-conspirator during the pendency of that conspiracy admitting to
23   the crime.

24       "THE COURT: Okay. Anything further, Mr. Siino?

25       "MR. SIINO: No conspiracy charge, Your Honor.

26

---

27      [6]   The court made it clear that it was using the term "confessions" to
extend also to partial admissions of guilt. (People v. Fletcher, supra, 13 Cal.4th
28   451, 455, fn. 1.)

1

2          "THE COURT: I understand. [¶] The objection is overruled, the charge is not required.

3          "BY MS. KNOX:

4          "Q. What did Darryl tell you about the shooting that happened on Davi Street?

5

6          "A. Him, Jam, Tiffany-Alvin shot some dude over on Davi.

7          "[¶] ... [¶] Q. And when the shooting happened were the four of them on foot or were they in some sort of vehicle?

8          "A. A white Buick."

9          "[¶] ... [¶] Q. Okay. And did Dal tell you why he shot Irving Griffin?

10

11         "A. No.

12         "Q. Do you recall talking to Detective-

13         "MR. SIINO: Objection, move to strike. Presumes-calls for a conclusion and fact not in evidence.

14         "THE COURT: What does?

15         "MR. SIINO: Why he shot someone. There is no evidence as to who-anybody shooting anybody.

16

17         "[¶] ... [¶] THE COURT: I may have got it wrong, so if you want to-

18         "BY MS. KNOX:

19         "Q. Okay. Did Darryl tell you who shot the guy on Davi Street?

20

21         "A. He did.

22         "Q. Darryl shot the guy on Davi Street, And he was with-

23         "A. Jam-

24         "Q. Jam-

25         "A. Tiffany and Alvin.

26         "Q. Okay. Did Darryl tell you why he shot that guy?

27         "A. No.

28         "[¶] ... [¶] Q. Do you recall telling Detective Deplitch that Darryl told you that they shot the guy on Davi Street ... because that

guy had, quote, unquote, been in Darryl's business?

"A. Yeah.

"Q. Okay. And do you also ... recall Darryl telling you anything that had happened involving this victim before that shooting?

"A. No.

"Q. Do you recall telling Detective Deplitch that Darryl had told you that he and Jam had shot that same guy-

"A. Oh, before-

"Q. -in the-

"A. -yeah.

"[¶] ... [¶] Q. Okay. So Darryl did tell you that he had shot the same guy-

"A. Yeah, before.

"[¶] ... [¶] Q. Did Darryl tell you that the guy they shot on Davi Street hadn't learned the first time so they had to shoot him again?

"MR. KELLY [counsel for Gordon]: Objection, leading.

"[¶] ... [¶] THE COURT: Overruled, I'll permit it.

"THE WITNESS: Yeah."

Gordon necessarily concedes he did not make the specific and contemporaneous objection required by Evidence Code section 353, subdivision (a) to preserve the issue of the allegedly erroneous admission of evidence for review, as the "leading" objection by Gordon's counsel cannot be read to advise the trial court of an Aranda-Bruton problem. Gordon nevertheless argues that "Given the court's ruling on Daniels's objection, an additional objection from Gordon was unnecessary." He asserts that "Daniels timely objected to the evidence at issue under the hearsay rule," at which point "the duty of affirmative action shifted to the prosecution." Not so. Gordon cannot now associate himself for the first time with Daniels's objection (e.g., People v. Sanders (1990) 51 Cal.3d 471, 508; People v. Brown (1980) 110 Cal.App.3d 24, 35), especially as there is specific precedent from our Supreme Court that an Aranda-Bruton objection is not preserved for review unless precisely articulated to the trial court. (E.g., People v. Hill (1992) 3 Cal.4th 959, 994-995; People v. Mitcham (1992) 1 Cal.4th 1027, 1044; People v. McGautha (1969) 70 Cal.2d 770, 785 .)

Gordon then argues, relying upon People v. Partida (2005)

12

37 Cal.4th 428, that his objection was sufficient to preserve his Aranda-Bruton claim for review. In Partida, the trial court admitted evidence of the defendant's gang involvement over his objection that the evidence was more prejudicial than probative. On appeal, the defendant argued for the first time that the trial court's overruling of his Evidence Code section 352 objection violated his federal due process rights. The Supreme Court held that the objection was not sufficient to include the new due process argument: "On appeal, defendant may argue that the court erred in its ruling. But he may not argue that the court should have excluded the evidence for a reason different from his trial objection. If he had believed at trial, for example, that the trial court should engage in some sort of due process analysis that was different from the Evidence Code section 352 analysis, he could have, and should have, made this clear as part of his trial objection. He did not do so. Accordingly, he may not argue on appeal that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument." (Id. at p. 435.)

We do not understand how Partida favors Gordon. On the contrary, to invoke it seems to underscore the applicability of the traditional waiver analysis. The only objection made by Daniels was that the testimony the prosecutor was seeking to elicit was "hearsay." The hearsay rule, and its myriad of exceptions, is not shorthand for an Aranda-Bruton objection. To cite only the most obvious difference, Aranda-Bruton only applies in the far less common setting of a trial involving more than one criminal defendant, one of whom has made a statement that incriminates not only himself or herself, but also incriminates a codefendant. Another significant difference is that the judicial responses are very dissimilar. With a hearsay objection, the evidence either is admitted or it is excluded. But with Aranda-Bruton, the evidence may be admissible only if the trial court can alter the evidence by redacting its constitutionally objectionable parts, or, if that is not possible, by ordering separate trials. (See People v. Aranda, supra, 63 Cal.2d 518, 530-531.) A simple hearsay objection would hardly alert a trial court that these consequences might loom. In the language of Partida, such an objection would clearly require an analysis very different from that resolving an Aranda-Bruton objection. (People v. Partida, supra, 37 Cal.4th 428, 435.)

In light of the foregoing, we conclude there is no basis for relaxing the requirement that a specific and contemporaneous objection at trial is required to preserve for review a claim that evidence was erroneously admitted. Because Gordon did not make anything that can reasonably be interpreted as an Aranda-Bruton objection, he cannot make a direct attack on a ruling the trial court was not asked to make. (E.g., People v. Rowland (1992) 4 Cal.4th 238, 259; People v. Lilienthal (1978) 22 Cal.3d 891, 896.)

People v. Daniels, 2009 WL 568918 at *12-14 (footnote in original but renumbered).

///

1       The California Court of Appeal held that petitioner's <u>Aranda-Bruton</u> claim

2 was not preserved for appeal because counsel did not make a contemporaneous

3 objection on that ground.  The Ninth Circuit has recognized and applied the

4 California contemporaneous objection rule in affirming denial of a federal

5 petition on grounds of procedural default.  <u>See</u> <u>Inthavong v. Lamarque</u>, 420 F.3d

6 1055, 1058 (9th Cir. 2005); <u>Paulino v. Castro</u>, 371 F.3d 1083, 1092-93 (9th Cir.

7 2004); <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999).  And petitioner

8 has made no attempt to avoid the effect of the rule by showing cause and

9 prejudice.  Thus, to whatever extent petitioner may have intended to raise here

10 the merits of the <u>Aranda-Bruton</u> claim, that claim is barred.

11       As noted above, however, the Court also will consider whether counsel

12 was ineffective in failing to object on <u>Aranda-Bruton</u> grounds.

13       In ruling on this claim, the California Court of Appeal said:

14             Anticipating that we would reach this conclusion, Gordon
reframes the issue as one of his trial counsel's incompetence for not

15 making a sufficient objection that would have preserved the
<u>Aranda-Bruton</u> issue for appeal. This is allowed. (<u>See</u> <u>People v.</u>

16 <u>Coffman and Marlow</u> (2004) 34 Cal.4th 1, 82.)

17         " 'In order to establish a claim of ineffective assistance of
counsel, defendant bears the burden of demonstrating, first, that

18 counsel's performance was deficient because it "fell below an
objective standard of reasonableness [¶] ... under prevailing

19 professional norms." [Citations.] Unless a defendant establishes the
contrary, we shall presume that "counsel's performance fell within

20 the wide range of professional competence and that counsel's
actions and inactions can be explained as a matter of sound trial

21 strategy." [Citation.] If the record "sheds no light on why counsel
acted or failed to act in the manner challenged," an appellate claim

22 of ineffective assistance of counsel must be rejected "unless
counsel was asked for an explanation and failed to provide one, or

23 unless there simply could be no satisfactory explanation."
[Citations.] If a defendant meets the burden of establishing that

24 counsel's performance was deficient, he or she also must show that
counsel's deficiencies resulted in prejudice, that is, a "reasonable

25 probability that, but for counsel's unprofessional errors, the result of
the proceeding would have been different." [Citation.]' " (<u>People v.</u>

26 <u>Lopez</u> (2008) 42 Cal.4th 960, 966 (<u>Lopez</u>); accord, <u>People v.</u>
<u>Salcido</u> (2008) 44 Cal.4th 93, 152.)

27

28           The statements made by Daniels clearly qualify as
admissions, and are thus admissible against him. (Evid. Code, §

1220; People v. Lewis, supra, 43 Cal.4th 415, 497; People v. Horning, supra, 34 Cal.4th 871, 898, fn. 5.) However, because certain of the statements incriminate Gordon, they would not be admissible against him under Aranda-Bruton. We therefore presume that reasonably competent counsel would have raised an Aranda-Bruton objection and sought to have Daniels's statements redacted to delete reference to Gordon.[7] Nevertheless, we conclude that omission was not prejudicial.

The clear import of the statement had Daniels confessing that he shot Griffin because Griffin had interfered "in Darryl's business." Gordon was present, but he was not identified as taking an active role. On the other hand, this incident is stated to be the second attempt on Griffin, and Gordon is tied to that shooting as well. But the few, often elliptical references to Gordon pale in comparison to the impact of Tiffany Hart's recorded interview with Office Deplitch, where Hart-who was an eyewitness-described in detail Gordon's part in the Griffin shooting. In addition, the testimony of Officer Deplitch had Griffin himself fingering Gordon as one of his attackers. We believe that this evidence would have much greater heft with the jury. Thus, deducting the scattered references to Gordon in this part of Hardy's testimony still leaves ample evidence of guilt. Accordingly, we conclude that Gordon has not shown that this omission was prejudicial, that is, that there is a reasonable probability of a more favorable result. (Lopez, supra, 42 Cal.4th 960, 966.)

People v. Daniels, 2009 WL 568918 at *15 (footnote in original but renumbered).

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970). In the landmark case of

---

[7]   Citing Crawford v. Washington (2004) 541 U.S. 36, the Attorney General argues that there was no confrontation problem because Daniels's statements were not testimonial. Our Supreme Court appears to have rejected this argument:

"Codefendant Clark's statement to police was redacted to delete any reference to another person. Defendant contends that admission of the statement was erroneous under Crawford v. Washington.... [¶] ... [¶] [T]he claim lacks merit. Crawford addressed the introduction of testimonial hearsay statements against a defendant. Clark's redacted statement contained no evidence against defendant. [Citation.] Thus, it cannot implicate the confrontation clause. [Citations.] The same redaction that 'prevents Bruton error also serves to prevent Crawford error .' [Citation.]" (People v. Stevens (2007) 41 Cal.4th 182, 198-199.)

1   Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court

2   set forth the standard, a two-pronged test, for evaluating claims for ineffective

3   assistance of counsel. First, petitioner must establish that counsel's performance

4   was deficient. Id. at 687–88. Here, the California Court of Appeal assumed for

5   the sake of decision that counsel's performance was deficient and resolved the

6   issue on the second, prejudice, prong. This Court will do the same. See id at 697

7   (court need not determine whether counsel's performance was deficient before

8   examining the prejudice suffered by the defendant as the result of the alleged

9   deficiencies); Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995)

10   (applauding district court's refusal to consider whether counsel's conduct was

11   deficient after determining that petitioner could not establish prejudice).

12       Strickland's second prong requires a showing "that counsel's errors were

13   so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable."

14   Strickland, 466 U.S. at 687. To establish prejudice under Strickland, petitioner

15   "must show that there is a reasonable probability that, but for counsel's

16   unprofessional errors, the result of the proceeding would have been different. A

17   reasonable probability is a probability sufficient to undermine confidence in the

18   outcome." Id. at 694-95. Because § 2254(d)(1) applies here, the question for the

19   Court is whether the Court of Appeal's conclusion that petitioner was not

20   prejudiced by counsel's failure to object was "reasonable." See 28 U.S.C. §

21   2254(d)(1); Cullen v. Pinholster, 131 S. Ct. 1388, 1410 (2011) (applying

22   "unreasonable application" standard to state court's analysis of prejudice prong

23   of Strickland).

24       The Supreme Court has said that a state court decision is "reasonable" as

25   that word is  used in § 2254(d)(1) when ""'fairminded jurists could disagree' on

26   the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct.

27   770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004));

28   see also id. at 786-87 (petitioner must show the state court's decision "was so

16

1    lacking in justification that there was an error well understood and comprehended

2    in existing law beyond any possibility for fairminded disagreement.").  The court

3    "must determine what arguments or theories supported or . . . could have

4    supported, the state court's decision; and then it must ask whether it is possible

5    fairminded jurists could disagree that those arguments or theories are inconsistent

6    with the holding in a prior decision of [the Supreme] Court." Id. at 786; see, e.g.

7    id. at 788-92 (rejecting 9th Circuit's hypothesized determination that there was no

8    downside risk for counsel to investigate blood evidence and explaining various

9    reasons that the state court could have relied on to conclude otherwise in state

10   court's unexplained denial of the claim).  The unreasonableness test is not a test

11   of the reviewing court's "confidence in the result it would reach under de novo

12   review." Id. at 786 (9th Circuit erred in finding state court's rejection of

13   Strickland claim unreasonable based on its confidence that the claim had merit).

14   "[A] strong case for relief does not mean the state court's contrary conclusion was

15   unreasonable." Id.

16        Here, the legal basis for the state court's decision was the second prong of

17   Strickland, the case that the court correctly identified as controlling whether

18   counsel was constitutionally ineffective.  As to whether reasonable jurists could

19   at least  disagree whether the state court's application of that prong was correct,

20   the state court explained that there was not a reasonable probability of a different

21   result had counsel made an Aranda-Bruton objection and succeeded in obtaining

22   a redaction of the statement, because (1) the hearsay statement referred only

23   passingly to petitioner, (2) Tiffany Hart's statement was much more compelling,

24   and (3) there was evidence that the victim had identified petitioner as involved in

25   the shooting. People v. Daniels, 2009 WL 568918 at *15.  Certainly reasonable

26   jurists could find this rationale persuasive.  This claim is without merit.

27   ///

28   ///

17

1

2.     **Juvenile Adjudications**

2      Petitioner contends in the petition itself that the sentencing court's use of

3  his two prior juvenile convictions as "strikes" violated his Sixth Amendment

4  right to a jury trial, because the juvenile convictions were obtained in a

5  proceeding where there is no right to a jury trial.  The petition for review attached

6  to the petition presents the Sixth Amendment issue, and also contains a claim that

7  the evidence was not sufficient to support the sentencing court's conclusion that

8  he had suffered two strike convictions.  Because petitioner is pro se, the Court

9  will consider both issues.

10     In Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000), the Supreme

11 Court held that the Sixth Amendment requires that "[o]ther than the fact of a

12 prior conviction, any fact that increases the penalty for a crime beyond the

13 prescribed statutory maximum must be submitted to a jury, and proved beyond a

14 reasonable doubt."  Id. at 490.  Petitioner argues that his juvenile convictions do

15 not come within Apprendi's exception for prior convictions.

16     Petitioner's Apprendi claim is easily disposed of.  The court of appeal held

17 that under California law a qualifying strike must be pleaded and proved beyond

18 a reasonable doubt, thus meeting the Apprendi requirements.  People v. Daniels,

19 2009 WL 568918 at *23.  That holding as to California law is binding on this

20 Court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's

21 interpretation of state law, including one announced on direct appeal of the

22 challenged conviction, binds a federal court sitting in habeas corpus).  Thus, as

23 the court of appeals recognized, the prior conviction exception of the Apprendi

24 rule is irrelevant, and so is the case petitioner primarily relies upon, United States

25 v. Tighe, 266 F.3d 1187 (9th Cir. 2001), which involved the prior conviction

26 exception.[8]  See id. at 1194-95; People v. Daniels, 2009 WL 568918 at *23.

27

28     [8] To whatever extent petitioner may be trying to contend that it is
unconstitutional to enhance a sentence for a prior conviction as to which a jury

Petitioner contends in the petition for review by the California Supreme Court attached to the federal petition that there was insufficient evidence to support the sentencing court's conclusion that he had suffered two prior juvenile offenses. He does not dispute that he did in fact suffer them. The evidence of the prior convictions was two charging documents on each of which was inscribed the word "nolo." People v. Daniels, 2009 WL 568918 at *22. The California Court of Appeal held that "this is enough, but only barely." Id. at 21. Even if this Court were inclined to say that this amount of evidence is insufficient to cross the "barely enough" line, that would not suffice to allow petitioner relief; as discussed above, to overcome the deference allowed to the state court opinion by § 2254(d)(1), petitioner must show that the state court's rejection of this claim was "unreasonable." That he has not done. Habeas relief cannot be granted on this claim.

### 3.    Prosecutorial Misconduct and Ineffective Assistance of Counsel

Petitioner contends that the prosecutor committed misconduct in closing argument by arguing facts not in evidence, and that his counsel was ineffective in not objecting to some of the statements. The statements that purportedly were not supported by the evidence listed by petitioner in his petition for review are (1) a reference to witness Hardy receiving threats during the prosecution of the case; (2) references to Hardy's friend Mary witnessing threats, and Mary walking her home once because of Hardy's fear; and (3) a statement by witness Williams about a photo array. Petitioner contends that counsel was ineffective in not objecting to statements (1) and (3).

///

///

---

trial was not available, independently of the Apprendi line of cases, that contention cannot be grounds for relief because there is no clearly established Supreme Court authority on the point.

### a.   References to Hardy's Friend Mary

The California Court of Appeal discussed the claims involving the threats against Hardy:

> [One of Gordon's claims] involves one of the not-so implicit threats to keep Hardy from telling what she knew. Hardy testified that she as at the home of a friend named Mary. Daniels was present. According to Hardy, "Five minutes later Jam [Gordon] called on the phone and it was like we know you been talking to the police ... if we find out you have been talking to the police we going to kill you, I'm killing mommas, I'm killing daddies, I'm killing kids, it don't matter. I'm killing everybody." Asked by the prosecutor "Did Darryl Daniels have anything to say during or after this conversation in reference to you talking to police?" Hardy answered, "He just laid a gun on his lap."
>
> In closing argument the prosecutor stated that Hardy "testified to you that on at least one occasion she was threatened at her friend Mary's home. Mary witnessed the threats, and Mary walked her home to her father's house." Gordon's counsel objected: "not only is it patently untrue, but ... it's outside the evidence." The trial court in effect overruled the objection, stating "I don't recall the testimony about Mary, but it may be. [¶] It's up to the jury to decide whether ... that comment is supported by the evidence. So the jury will decide whether that has been proven or not."

People v. Daniels, 2009 WL 568918 at *19.

That is, Hardy's testimony supported the prosecutor's contention that petitioner threatened her in one phone call, but not the contention that Mary, who did not testify, witnessed the threats or that she walked Hardy home.  The court of appeal dealt with this claim thus:

> [A] careful reading of Hardy's transcript shows that the trial court's ruling was sensible on the major point. Although Hardy did not expressly testify that Mary was aware of a threat explicit in Gordon's call and implicit in Daniels's gesture, it is not an unreasonable inference. It was, after all, Mary's house, and she presumably was present. If it is inferable that Daniels's gesture was timed to respond to the content of Gordon's call, it is inferable that Daniels was aware of the call's content. It would be no less inferable that Mary had a similar awareness.
>
> The crucial-and undisputed-point of the testimony was that Hardy did in fact receive threats obviously aimed to preserve her silence. The number of persons beside Hardy who overheard the threats was tangential, to the point of irrelevance. We conclude there could be no prejudice in the trial court's overruling Gordon's objection as to this portion of the prosecutor's argument.

1    However, the prosecutor's argument that after witnessing the
2    threat "Mary walked her home to her father's house" is not
supported by Hardy's testimony. Nevertheless, the point is so
inconsequential that it cannot qualify as prejudicial. (Lopez, supra,
3    42 Cal. 4th 960, 966; People v. Lanphear, supra, 26 Cal. 3d 814,
828-829.) In addition, counsel could have decided that an objection
4    might only have drawn the jury's attention to the point most
disadvantageous to Gordon-the undisputed fact of the threat uttered
5    over the phone, which in turn might remind the jury of other threats
recounted by Hardy. Trial counsel's decision not to object has not
6    been shown to be outside the realm of reasonable tactical choice.
(E.g., Lopez, supra, 42 Cal. 4th 960, 966; People v. Weaver, supra,
7    Cal. 4th 876, 925-926.)

8    Id.

9    The portion of the paragraph immediately above discussing "[t]rial

10   counsel's decision not to object" is inexplicable.  Counsel did object, saying:

11   "Objection, your Honor, not only is it patently untrue, but, objection, it's outside

12   the evidence that is – I object.  Just not true." RT 995.  That is, this issue is one

13   of pure prosecutorial misconduct, not ineffective assistance of counsel for failure

14   to object to prosecutorial misconduct, as is the case with the other two instances.

15   In any event, the court of appeal was not only reasonable but correct in

16   stating that the number of nontestifying persons who overheard the threat is

17   virtually irrelevant, and so is whether Mary felt the need to walk Hardy home.  In

18   addition, the trial court instructed the jurors to rely on their own recollection of

19   the testimony and that arguments of counsel are not evidence, thereby mitigating

20   any ill-effect.  RT 996.  The brief comments in closing that were not supported by

21   the evidence were not such as to render the trial "fundamentally unfair."  See

22   Darden v. Wainwright, 477 U.S. 168, 181 (1986) (prosecutorial misconduct rises

23   to the level of a due process violation only if it renders a trial "fundamentally

24   unfair.").

25        **b.    Photo Array**

26   Petitioner also contends that the prosecutor made a misstatement in

27   closing about a photo array viewed by one of the victims, Audie Williams.  The

28   court of appeals had this to say about the claim:

1

2

        The second object of Gordon's attack is the testimony of robbery victim Audie Williams and what the prosecutor made of it.

3

4

5

6

7

8

        Williams testified that Officer Deplitch showed him a photo array in which Gordon's photo was already circled. Officer Deplitch denied that the line-up he showed to Williams had Gordon's photograph already circled, that the circling was done by Williams when he made the identification and initialed the photo array. In her closing argument the prosecutor told the jury: "Mr. Williams testified to you that Detective Deplitch went-he brought that photo lineup to him, had already circled Charles Gordon's picture and written the name 'Jam' underneath as an attempt to explain how that photo lineup was conducted. [¶] Well, you can look at the photo lineup yourselves. It's very clear that there is a circle around the picture of Charles Gordon and the initials 'A.W.' The word 'Jam' appears nowhere on that photo lineup."

9

10

11

12

13

14

15

16

17

18

19

        Gordon argues that "In testifying that Gordon's picture was pre-circled, Williams in turn questioned Detective Deplitch's credibility and motivation. The jury had seen-and had in the jury room ... the photo lineup at issue. And it [confirmed] the prosecutor's argument: The name 'Jam' was not written on Gordon's picture. The fact that the actual dispute was about the circling, not the name, was likely lost on the jury at that point." But there was no misconduct, merely a divergence in testimony, simply a credibility contest between Williams and Deplitch. And once the evidence was in, the absence of the word "Jam" on the lineup was surely a point the prosecutor was entitled to argue in her closing argument. (People v. Dennis (1998) 17 Cal.4th 468, 522.) "Defense counsel's performance cannot be considered deficient if there was no error to object to." (People v. Eshelman (1990) 225 Cal. App. 3d 1513, 1520.) An objection would have been pointless, and futile efforts are not required of trial counsel. (See People v. Anderson (2001) 25 Cal. 4th 543, 587; accord, People v. Jackson (1989) 49 Cal.3d 1170, 1189; People v. Jones (1979) 96 Cal. App. 3d 820, 827.)

20

People v. Daniels, 2009 WL 568918 at *19-20.

21

        The prosecutor misstated Williams' testimony; Williams did not say that

22

the word "Jam" was written on the photo array when the detective brought it to

23

him. RT 714-17. The state conceded as much in its Respondent's Brief. Resp't

24

Br. 74. There thus was more than a "divergence in testimony," as the court of

25

appeal characterizes it.

26

        When she made the misstatement, the prosecutor was attempting to show

27

that Williams' testimony that petitioner was not the person who robbed him was

28

the product of the threats he had received. She reminded the jury how when

1    Williams first saw the photo array he had picked out petitioner, but shortly

2    thereafter told the detective that he had been threatened and would no longer

3    cooperate. RT. 956.  She pointed out the threats received by other witnesses,

4    then said:

5              Does the fact that Mr. Williams received threats to his life
       have a ring of truth to it?  Mr. Williams testified to you that
6       Detective Deplitch went – he brought that photo lineup to him, had
       already circled Charles Gordon's picture and written the name
7       "Jam" underneath as a[n] attempt to explain how that photo lineup
       was conducted.

8
               Well, you can look at the photo lineup yourselves.  It's very
9       clear that there is a circle around the picture of  Charles Gordon and
       the initials "A.W.."  The word "Jam" appears nowhere on that
10      photo lineup.

11             So, ladies and gentleman, think carefully about whether or
       not those threats to his life and his fear to come forward and testify
12      against Charles Gordon have a ring of truth to them.

13   RT  956-57 (emphasis added).[9]  The prosecutor then went on to another subject.

14   RT 557.

15           To whatever extent petitioner might be attempting to assert a direct

16   prosecutorial misconduct claim, it is barred by counsel's failure to object and his

17   failure to show any grounds for avoiding the procedural bar.  See Inthavong, 420

18   F.3d at 1058.

19           The alternative claim, that counsel was ineffective in failing to object,

20   fares no better.  To show ineffective assistance petitioner must establish that

21   counsel's failure to object was deficient performance and that it was reasonably

22   likely the outcome would have been different had he objected.  See Strickland,

23   466 U.S. 687-88.  In making the quoted argument, counsel was attempting to

24   show that Williams' trial testimony – which included his testimony that petitioner

25   was not the man who robbed him – was untrue, the product of the threats he had

26

27   ─────────────────────

              [9] The part of the argument that is not supported by the evidence is
28   underlined.

                                    23

1  received.  She pointed to the purported inconsistency between his testimony that

2  Detective Deplitch had written "Jam" on the photo array and the fact that there

3  was not such name on the actual exhibit to illustrate that Williams' testimony in

4  court was not true.

5       But her execution of this argument was confusing; it was not obvious how

6  the purported inconsistency between Williams' statement that the name was on

7  the photo array and its absence on the exhibit could give "the ring of truth" to the

8  proposition that he had received threats, although it may be that on careful

9  consideration there is some salience to the point.  Given that counsel is often

10  reluctant to object in opening and closing for fear of the jury thinking counsel is

11  trying to conceal something, or would resent the interuption; the lack of clarity of

12  the prosecutor's point; and that there was direct evidence from Detective

13  Deplitch that Williams told him that he had been threatened, defense counsel's

14  failure to object to this small misstatement of the evidence was not deficient

15  performance.  And for the same reason, petitioner could not have been prejudiced

16  by it.  Counsel was not ineffective in failing to object.

17            c.    **Threats Against Hardy During Prosecution of the Case**

18       In closing, the prosecutor said, just before the portion of the argument

19  quoted above:  "Rhonda Hardy received repeated threats to her life, all the while

20  that this prosecution has been pending."  RT 956.  Petitioner contends in the

21  petition for review attached to his federal petition that the "while this prosecution

22  has been pending" portion of this statement was not supported by the evidence,

23  and that counsel was ineffective in failing to object to it.  Because he is pro se,

24  the Court will treat this claim as properly raised.

25       This claim, although raised on direct appeal, was not discussed by either

26  the court of appeal or the California Supreme Court, but that does not prevent this

27  Court from affording the implied rejection of the claim the deference required by

28  § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011) ("When a

24

1  federal claim has been presented to a state court and the state court has denied

2  relief, it may be presumed that the state court adjudicated the claim on the merits

3  in the absence of any indication or state-law procedural principles to the

4  contrary."). To do so the Court undertakes an independent review of the record

5  to determine if the implied rejection of the claim was unreasonable. See

6  Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).

7       It is undisputed that Hardy testified to receiving threats; the issue is

8  whether the facts support the prosecutor's statement that those threats continued

9  while the "prosecution is pending." This in turn depends on whether the offer by

10  the codefendant's father of a bribe to remain silent, which was made after

11  petitioner and his codefendant had been arrested, could be characterized as a

12  "threat." Hardy testified that the offer scared her, and she promptly went into the

13  witness protection program. RT 354. Given the wide leeway to draw inferences

14  from the evidence allowed in closing argument, an objection to the prosecutor's

15  statement would not have been sustained, so counsel was not ineffective in

16  failing to make one. And for the same reason, his failure to object could not have

17  prejudiced petitioner. This claim is without merit.

18      **4.**    **Hearsay Evidence as to Count One**

19       Petitioner contends that his counsel was ineffective in not objecting to

20  certain hearsay evidence. The court of appeal explained the claim:

21          Gordon's second claim of trial counsel incompetence must
   be viewed against two excerpts of testimony elicited by the

22  prosecutor in direct examination of two of witnesses in her
   case-in-chief. The first witness was Blanche, who, it will be

23  recalled, met with Griffin in the hospital after he was shot, and who
   talked with Officer Deplitch. The parts of Blanche's testimony

24  about which Gordon complains have been italicized:

25          "Q. And did you tell Detective Deplitch that you had known
   both Charles Gordon and Darryl Daniels for about ten years, and

26  that you commonly referred to them by their street names Dal and
   Jam?

27          "[¶] ... [¶] A. Right....

28

1   "Q. And did Detective Deplitch then ask you why you had specifically asked if Irving Griffin-if Dal and Jam were the people that shot him?

2

3   "A. I didn't ask him.

4   "MR. SIINO [counsel for Daniels]: Objection, leading, your Honor .[¶] Uhmm, may I approach, Your Honor?

5

6   "THE COURT: Yes.

   "(Discussion at bench, not reported)

7

8   "THE COURT: The last objection is overruled.

9   "BY MS. KNOX:

10  "Q. Did Detective Deplitch ask you specifically *why you asked Irving Griffin if Dal and Jam had shot him*?

11

12  "A. I didn't ask him that.

   "Q. Okay. And then did *you tell Detective Deplitch that
13  Irving Griffin had told you that for about a month before the shooting he had been in several arguments with Darryl Daniels*?

14

15  "A. *Yeah*.

   "[¶] ... [¶] Q. Okay. And did you also tell Detective Deplitch
16  that your reason for asking if it was Dal and Jam that shot Irving Griffin was that *you had heard on the streets that Darryl Daniels
17  did not like Irving Griffin*?

18  "A. No."

19  The second witness was Officer Deplitch, and the relevant excerpts are as follows:

20
   "Q. Did you ask Mr. Blanche why he specifically asked
21  Irving Griffin if Dal and Jam had shot him?

22  "A. Yes, I did.

23  "Q. And what did Mr. Blanche tell you?

24  "A. He said his reasoning for this was based on the prior month to the shooting *Irving Griffin had told him about numerous
25  altercations that Irving had evidently been in with Darryl Daniels and Charles Gordon*.

26
   "Q. Did Mr. Blanche tell you that there was any other reason
27  for him asking that question?

28  "A. *Yes*, he did.

"Q. And what did he tell you?

"[¶] ... [¶] A. Because *he had heard from subjects who he associated-associated with or a subject, he would not provide names, but had been told that they were the [ones] responsible.*" (Italics added.)

"[¶] ... [¶] BY MR. KELLY (counsel for Gordon):

"Q. Now, did Derrick tell you that *someone had told him Dal and Jam were the responsibles?*

"A. Yes, because when I specifically [asked] him why he specifically said the names of Dal and Jam.

"Q. And are you confident that he didn't hear that from police personnel?

"A. *Yes,* I am.

"Q. Okay. And why are you confident of that?

"A. Because he tends to associate and hang out in the areas *where Mr. Gordon and Mr. Daniels prior to this tended to frequent, and they knew a lot of the same people.*

"Q. So you figured *he heard it on the street* sometime in the hours preceding your meeting with him?

"A. *He told me that, yes.*" (Italics added.)

People v. Daniels, 2009 WL 568918 at *16-17.

In rejecting the claim, the court of appeal said:

Gordon argues that Blanche's statements were riddled with hearsay that: (1) Blanche had been in several arguments with Daniels, (2) Griffin had had "numerous altercations" with Daniels and Gordon, and (3) people "on the street" were saying that Daniels and Gordon were "responsible" for Griffin's shooting, and that those statements that should have drawn objections if his trial counsel had been competent. We do not agree.

Gordon's trial counsel subsequently cross-examined Officer Deplitch about the basis for Blanche's statement that Daniels and Gordon were the "responsibles" for the Griffin shooting. In doing so, counsel planted the suggestion that what actual knowledge Blanche had came from law enforcement,[10] a point that merged

---

[10] "Q. Now, did Derrick tell you that someone had told him Dal and Jam were the responsibles? [¶] A. Yes, because when I specifically [asked] him why he specifically said the names of Dal and Jam. [¶] Q. And are you confident that

27

with counsel's suggestion that the prosecution had planted evidence that tainted the identification of Gordon made by robbery victim Audie Williams (see discussion *post*). The Attorney General has, we think, cogently captured counsel's intent:

"[I]t is readily apparent that counsel for Gordon wanted to explore this area rather than foreclose it, and thus had a tactical reason for withholding objection.... [¶] The most damaging portion of Blanche's statement was already properly before the jury, namely Blanche's report that Griffin identified Daniels and Gordon as the assailants. That identification by Griffin was devastating because it fully confirmed Hart's testimony describing the shooting. [¶] Defense counsel therefore had a strong incentive to suggest to the jury that Griffin did not identify Daniels and Gordon based on actually seeing them at the time of the shooting. Rather, counsel for Gordon wanted to plant the seed that Griffin merely assumed it was them based on his prior problems and based on the speculation on the street that Daniels and Gordon may have done it. By so doing, counsel was subtly attempting to transform Griffin's identification from one based on an actual observation into one based on nothing more than Griffin's speculation flowing from rumors on the street and prior disputes. This allowed counsel for Gordon to discount Griffin's identification and focus his attack squarely on Hart as the only eyewitness, which is precisely what he did in closing."

"If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' "(<u>People v. Diaz</u> (1992) 3 Cal. 4th 495, 557, quoting <u>People v. Pope</u> (1979) 23 Cal. 3d 412, 425.) Moreover, it must be presumed that counsel's decisions are within the realm of reasonable tactical choice unless the appellate record proves otherwise. (E.g., <u>Lopez</u>, <u>supra</u>, 42 Cal. 4th 960, 966; <u>People v. Weaver</u> (2001) 26 Cal. 4th 876, 925-926; <u>People v. Mendoza Tello</u> (1997) 15 Cal. 4th 264, 266 and authorities cited.)" "'It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively ... Rather, the defendant must affirmatively show that the omission of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.' [Citations.]" <u>People v. Lanphear</u> (1980) 26 Cal. 3d 814, 828-829.)

Here, the record does show a reason for counsel's omission that is well within the realm of reasonable tactical choice. In any event, given the state of the evidence against Gordon on this charge, we could not find the choice to be prejudicial.

---

he didn't hear that from police personnel? [¶] A. Yes, I am. [¶] Q. Okay. And why ... are you confident of that? [¶] A. Because he tends to associate and hang out in the areas where Mr. Gordon and Mr. Daniels prior to this tended to frequent, and they knew a lot of the same people. [¶] Q. So you figured he heard it on the street sometime in the hours preceding your meeting with him? [¶] A. He told me that, yes."

1  People v. Daniels, 2009 WL 568918 at *17-18.

2       A "doubly" deferential judicial review is appropriate in analyzing

3  ineffective assistance of counsel claims under § 2254. See Pinholster, 131 S. Ct.

4  at 1410-11; Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (same); Premo v.

5  Moore, 131 S. Ct. 733, 740 (2011) (same). The general rule of Strickland, i.e., to

6  review a defense counsel's effectiveness with great deference, gives the state

7  courts greater leeway in reasonably applying that rule, which in turn "translates to

8  a narrower range of decisions that are objectively unreasonable under AEDPA."

9  Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v.

10 Alvarado, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is

11 not whether counsel's actions were reasonable. The question is whether there is

12 any reasonable argument that counsel satisfied Strickland's deferential standard."

13 Harrington, 131 S. Ct. at 788.

14       As the court of appeal pointed out, the challenged portions of the

15 testimony suggested that the witness was speculating about who shot Griffin

16 based on prior beefs, or from word on the street. Allowing this hearsay into

17 evidence without objection thus provided a ground for counsel to argue that.

18 This is a reasonable argument, so habeas relief cannot be granted on this claim.

19 See id.

20       **5.      Cumulative Effect**

21       Petitioner alleges that his above claims, even if they do not amount to

22 constitutional error in themselves, when added together show that the trial as a

23 whole was a violation of due process, i.e., cumulative error. But when there is no

24 constitutional error, there is nothing to accumulate. Mancuso v. Olivarez, 292

25 F.3d 939, 957 (9th Cir. 2002). This claim is without merit.

26 ///

27 ///

28 ///

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: DEC 2 8 2011

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.10\Gordon, C1.denial.wpd